**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **THE OSAGE NATION** acting through the | ) | |
| **OSAGE MINERALS COUNCIL**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **WIND CAPITAL GROUP, LLC**, | ) | |
| a Delaware limited liability company; | ) | Case No. 11-CV-643-GKF-PJC |
| **OSAGE WIND, LLC**, a Delaware limited | ) | |
| liability company; and | ) | |
| **WC INVESTMENT MANAGEMENT, LLC**, | ) | |
| fka **WIND CAPITAL INVESTMENT** | ) | |
| **MANAGEMENT, LLC**, aka/fka **WIND** | ) | |
| **CAPITAL INVESTMENT GROUP, LLC**, | ) | |
| a Missouri limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On December 14 and 15, 2011, this matter came before the Court for non-jury trial on plaintiff's claims for declaratory and injunctive relief. Having heard the evidence, the Court enters the following findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiff, The Osage Nation, is a federally recognized Indian tribe (referred to herein as "Plaintiff" or "the Tribe"). In this case the Tribe is acting through its Minerals Council, an independent agency within the Osage Nation established by Article XV of the Osage Nation Constitution. The Osage Minerals Council manages the Osage Mineral Estate.

2. In 1906, the U.S. Government severed the mineral estate from the surface of Osage County, retaining the Osage Mineral Estate in tribal trust ownership. The Bureau of

Indian Affairs handles the U.S. Government's trust duties, in part through the Osage Agency in Pawhuska, Oklahoma.  The U.S. Government, however, is not a party to this proceeding.

3.    Defendants Wind Capital Group, L.L.C. and Osage Wind, L.L.C. (collectively "Defendants" or "Osage Wind") are the developers of a wind energy project in Osage County ("Wind Farm").  Construction of the Wind Farm had been planned to begin in November, 2011.

4.    At the conclusion of the Tribe's evidence, defendant WC Investment Management, L.L.C. moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The court granted the motion without objection.

## Facts Relevant to the Merits of the Interference Claims[1]

5.    The Wind Farm has leased approximately 8,500 acres northeast of the town of Burbank, Oklahoma from a total of seven surface owners for the purpose of constructing a wind energy facility.

6.    The Wind Farm facilities will consist of 94 turbines, underground collection lines running between turbines and to a substation, one overhead transmission line, two permanent meteorological towers, and a network of access roads.  After construction, the estimated surface footprint of the Wind Farm facilities, including the surface of the ground above where the collection lines will be installed, is less than 1.5% of the 8,500 or so acres the Wind Farm has under lease.  The area of the planned Wind Farm is depicted on Defendants' Exhibit 1.

7.    Each turbine will be mounted on a tower at a height of 265 feet above the surface and will have three attached blades, with the tip of each blade extending approximately 165 feet

---

[1] As noted below in the Conclusions of Law, to prevail on its request for a permanent injunction, the Tribe must prove (1) success on the merits; (2) irreparable harm; (3) the harm to the Tribe outweighs the harm the injunction would cause the defendants; and (4) the injunction would not adversely affect the public interest.  The findings of fact are organized in conformity with the four requirements.

from the center of the turbine.  The turbine will rotate 360 degrees around the tower.  The lowest clearance of the tip of the blade from the surface will be 100 feet and will occur when the blade is parallel with the supporting tower.

8.      The turbine foundations will be made from reinforced concrete, with each foundation initially being 16 feet in diameter down to four feet below the surface, then expanding in a conical shape with a maximum diameter of 50 feet, to a depth of 10 feet.

9.      The turbines will be arranged by circuits, with an underground collection line buried four feet below ground running from turbine to turbine and then to a substation within the project boundary.   From the substation, the electricity will then be transported to an interconnection facility via a 138kV overhead transmission line approximately 1.8 miles long. KAMO Electric Cooperative will construct and own the interconnection facility, which will connect to KAMO's already existing overhead transmission line.  This line currently crosses the Wind Farm area and will continue to exist regardless of whether the Wind Farm is built.

10.      The estimated time of construction for the Wind Farm is 9 to 12 months.

11.      The land in the Wind Farm area is largely unoccupied, as shown in the photos of the area admitted into evidence. (Def. Ex. 3).  The land is currently used for grazing livestock, with some existing oil and gas production facilities.  Two highways (U.S. Highway 60 and State Highway 18) and two existing overhead electric transmission lines run through parts of the planned Wind Farm.  (Def. Ex. 1).

12.      The Tribe has leased its mineral interests within the Wind Farm area to Spyglass Energy Group, L.L.C., LINN Energy, L.L.C., Chaparral Energy, L.L.C., and Orion Exploration, L.L.C.  The area lies just east of the town of Burbank, Oklahoma.  The area was once the site of significant oil and gas activity following discovery of oil in 1920 from the Burbank sand.  The

area has recently seen increased drilling activity targeting the Mississippian formation.  The Mississippian has recently become economical to explore because of relatively high oil prices combined with improvements in horizontal drilling technology and hydraulic fracturing ("fracking").

13.     The Tribe's claims are generally predicated on the allegation the Wind Farm will unlawfully interfere with its rights to develop the Osage Mineral Estate.  As more specifically set forth below, the Court finds that Plaintiff's evidence fails to establish either of the following propositions:  first, under federal law, that the Wind Farm will interfere with the Tribe's right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for oil and gas development; or second, under state law, that the Wind Farm will unlawfully interfere with the Tribe's right to make reasonable use of the surface estate, including the right of ingress and egress therefor, for the purpose of exploring, severing, capturing and producing the oil and gas.

14.     The Tribe presented no evidence relating to actual or potential conflict with the operations of lessees Spyglass Energy, Linn Energy or Chaparral Energy.

15.     Lessee Orion Exploration ("Orion") has had drilling rights to 19,680 acres for more than three years, but has not yet drilled a well within the area of the proposed Wind Farm.  Less than 2,500 acres subject to Orion's leasehold rights overlap with the Wind Farm.

16.     The Court heard evidence of Orion's plans for future oil and gas development in the area.  Orion recently extended its leases pursuant to a Lease Acquisition and Exploration Agreement (the "Concession Agreement").  (Def. Ex. 14).  In November, 2011, Orion put the Concession Agreement into effect by paying approximately $3 million to the Tribe.   Under the Concession Agreement, Orion must drill the following horizontal Mississippian oil and gas wells

within the 19,680 acre Concession Area in order to maintain its leases: five wells before November 4, 2012, six additional wells before November 4, 2013, and seven additional wells before November 4, 2014. Orion is not required to drill within the boundaries of the Wind Farm in order to fulfill its obligations under the Concession Agreement.

17. During the construction phase of the Wind Farm, Orion plans to drill one (1) of its five (5) initial horizontal Mississippian wells in the Southwest Quarter of Section 24 of Township 26 North, Range 5 East (SW/4 T26N R5E). The well is to be the third of the five initial wells to be drilled during the first year. The testimony before the court was that the target location of that well is in the western one-third of that quarter section, an area west of the location identified for Defendant's turbine # 95. The Tribe has not proven that any Wind Farm components, including turbine # 95, will be constructed in locational proximity to this planned horizontal well. In addition, the Tribe has not proven that the drilling of the horizontal well will occur during Defendant's construction activities relating to turbine # 95. Mr. John Brown, Jr., Orion's Operation Manager, testified that it takes about two weeks to prepare the site for drilling, then 26 days from spudding the well to its completion, followed by about two weeks of dismantling.

18. Orion has placed tentative well locations within the Wind Farm area on a map, but acknowledges that the final well locations have not been selected, and will not be selected, for some time. As to the location of infrastructure, Orion's John Brown testified that until drill sites are chosen, location of necessary infrastructure cannot be determined. Because of the tentative nature of the well locations identified by Orion, the Court finds that the testimony of the Orion witnesses is insufficient to establish a conflict between the Wind Farm's planned surface use and Orion's planned future operations.

19.     Plaintiff's expert Michael Root did not establish that Wind Farm construction or operation would interfere with oil and gas mineral development.  His opinion—that the Wind Farm will be detrimental to oil and gas exploration and development and will leave the oil and gas operator without reasonable use of the surface—is not supported by the evidence.  The primary conflict predicted by the Tribe, through Mr. Root, is the potential for conflicts during Wind Farm construction.  According to Mr. Root, a conflict would arise if a lessee attempts to drill a well at the same time and in the same area as turbine construction.  Mr. Root's testimony with respect to alleged interference was speculative as to whether the lessee and the Defendants will be in the same place at the same time during construction.  He admitted that, even then, they might be able to stagger and co-ordinate their work.  He stated that, following construction and during operation and maintenance of the Wind Farm, there "would be an impact," but "it would not be as great as during construction."  When asked whether maintenance and operation of the Wind Farm would unreasonably interfere with the development of the Mineral Estate, he stated "it might, possibly."  The court finds Mr. Root's testimony speculative and insufficient to establish that the Wind Farm will interfere with development of the Osage Mineral Estate.  This court is not persuaded that, following construction of the Wind Farm, continuing operations and maintenance will unreasonably interfere with the proposed oil and gas drilling program and/or oil and gas operations by Plaintiff's lessees.

20.     The Tribe alleged in its Complaint and its arguments that the Wind Farm would impede oil and gas development because of "cancelled leases, inability to attract future lessees, and the inability to benefit fully from the mineral estate through the use of new technologies."  However, the head of the Osage Minerals Council, Mr. Galen Crum, conceded that no lessee has threatened to cancel its leases because of the Wind Farm.  Further, the evidence also shows that

Orion's Concession Agreement was not finalized until after the Wind Farm was publicly announced.  There was no evidence that Orion attempted to negotiate reduced bonus payments because of the Wind Farm.

21.     The court finds no evidence that the Wind Farm's surface use would prevent reasonable access to, and use of, the surface estate by oil and gas lessees.  However, in the event an actual conflict occurs, the court finds that it can and should be resolved by the parties in accordance with their respective obligations under federal and state law.  In the event a situation arises in which the defendants cannot accommodate an oil and gas lessee's request, the oil and gas industry has the ability, as defendant's expert John Campbell McBeath testified, to work around conflicts by modest adjustments in the form of directional drilling or moving the oil and gas wells slightly.  Orion's Operations Manager, Mr. Brown, testified that he still doesn't know there's going to be a problem, and that he finds he "can usually work around most things."  If a modest adjustment proves to be impossible, the lessee may seek redress of the specific dispute in a court of appropriate jurisdiction.

22.     Each permanent turbine site will be 70 feet by 70 feet.  During construction, there will also be a 40 foot by 80 foot temporary pad from which the turbine will be erected.  Access to the turbine construction site can be staged from any direction—including the direction opposite the well site.  A drilling rig would need roughly 100 feet from the edge of a drilling site to the wellhead, and from there drilling activities can typically be staged from any direction.  In the event the location of a particular drill site is closer than these distances allow, a modest adjustment to the drilling schedule or location may solve the conflict.

23.     The Court also finds that if a well location is selected within close proximity to a turbine center, or directly on a Wind Farm road or transmission line, Orion or other mineral

lessees will likely be able to make modest adjustments to the well location.  With the types of wells to be drilled, the currently available drilling technology, and the nature of the geological formations being targeted, a modest adjustment to provide the necessary setback from a turbine, or to move off a road or underground transmission line, could likely be reasonably accomplished by the mineral lessees.  The Court finds that such adjustments are well within the capabilities of the mineral lessees and that such adjustments are routinely made in the oil and gas industry.  In the event an actual, non-speculative, conflict develops that prevents a lessee from obtaining reasonable access to the surface estate, the law provides recourse.

24.     The Court further finds that the economics of the planned drilling program indicate that Orion will likely make necessary adjustments rather than forego development.  Using information from Orion, the testimony of both expert witnesses support a finding that the wells are sufficiently promising that the additional expense associated with adjusting the location will not be prohibitive.

25.     As to the oil and gas infrastructure such as flow lines, water lines, and tank batteries, the Court finds that any impact from the Wind Farm will be minimal.  To the extent such infrastructure is buried, it will be at different depths than the underground collection lines.  Orion can readily bore under Wind Farm roads if needed.  And if a desired flow line or water line happens to intersect a turbine location, only a minor adjustment is necessary to circumnavigate the 16 foot diameter of the foundation at the four foot subsurface level.  Further, Mr. McBeath testified, and this court finds, that the surface impediments in the area, even with the additional Wind Farm facilities, are fewer than what oil and gas companies normally encounter in their operations.  Mr. McBeath stated, and this court finds, that laying subsurface lines in and around the Wind Farm's collector lines will not present a significant obstacle to the

lessees. Mr. McBeath also presented maps showing that wind farms and oil and gas operations can and do co-exist in close proximity to each other, including in Oklahoma.  The Court finds this testimony to be credible.

26.     Defendant's expert testified, and this court finds, that the mud pulse system using a pressure wave to send data from downhole tools to the surface is not affected by magnetics or electrical interference, and should not be a factor impeding Plaintiffs' lessees from developing the Osage Mineral Estate.

### Facts Relevant to Irreparable Harm

27.     The Tribe leases its right to explore and develop the minerals to oil and gas companies in exchange for upfront bonus payments and royalty payments when oil and gas is actually produced and sold.  The Tribe's royalty interest is not burdened by any costs associated with oil and gas exploration or development.   In other words, if a lessee incurs additional expense because of the Wind Farm, that expense will not be passed on to the Tribe.

28.     The Tribe's interest can be harmed by the presence of the Wind Farm if the Wind Farm decreases the overall recovery of oil and gas from the mineral estate.

29.     The evidence at trial was insufficient to prove that the Wind Farm will result in decreased recovery of oil and gas from the mineral estate.  The Plaintiff did not establish that the planned wells cannot be drilled in their most desirable location.  Even if a selected well location is unavailable due to the construction or location of a Wind Farm component, the court finds that modest adjustments will not materially affect the recovery of oil and gas from the Osage Mineral Estate.

30.     The evidence at trial was insufficient to prove that any wells will not be drilled because of the Wind Farm.  The reserve calculations and revenue estimates presented at trial

predict the planned wells to be so profitable that the Wind Farm is unlikely to diminish a lessee's interest and enthusiasm for drilling.

31.     The Tribe has failed to prove that the Wind Farm will unreasonably interfere with plaintiff's right to make reasonable use of the surface estate.  Nor did the Tribe prove that the Wind Farm will unreasonably hinder its right to use so much of the surface as may be reasonable for oil and gas operations and marketing.

### Facts Relevant to the Balance of Harms

32.     The evidence at trial was insufficient to prove that the Tribe will be harmed by construction and/or operation of the Wind Farm.  At this time, the alleged conflict between the Wind Farm and plaintiff's rights to develop the Osage Mineral Estate is speculative.

33.     An injunction prohibiting the construction of the Wind Farm will cause the following harms to Osage Wind:  (a) it will lose approximately $40 million in expenses paid to date, including deposits for turbines and other equipment; (b) it will remain contractually obligated for more than $150 million of equipment purchases and construction contract penalties; and (c) it will lose the opportunity to make more than $30 million in estimated future profits.

### Facts Relevant to the Public Interest

34.     The Wind Farm project is expected to employ approximately 250 construction employees and 10-12 permanent employees.  The State of Oklahoma would lose the economic benefit of those jobs if the Wind Farm is enjoined.

35.     The Wind Farm is projected to generate $20 million dollars in local tax revenues over 20 years, including $1.5 million for Shidler schools during the first few years of the project. Those benefits would be lost if the Wind Farm is enjoined.

36.     An injunction would harm the surface owners who have leased their property to Osage Wind.  Under those leases, the surface owners would be entitled to receive lease payments over the 20-year life of the Wind Farm.

37.     The Wind Farm is projected to generate enough electricity to power 50,000 homes.  This renewable, relatively stable energy source would be lost if the Wind Farm is enjoined.

<u>Conclusions of Law</u>

**STANDARD FOR PERMANENT INJUNCTION**

1.     "A party requesting a permanent injunction bears the burden of showing:  (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."  *Fisher v. Oklahoma Health Care Authority,* 335 F.3d 1175, 1180 (10th Cir. 2003).  A permanent injunction may not issue if Plaintiff fails to satisfy any of the four factors.  *Fisher,* 335 F.3d at 1180.

2.     The Plaintiff has not carried its burden to satisfy any of the four factors and is, therefore, not entitled to injunctive relief as further discussed below.  And because Plaintiff has not carried its burden on the merits of its underlying claim for interference with its rights to develop the mineral estate, it is not entitled to declaratory relief.

**PLAINTIFF'S CLAIMS DO NOT SUCCEED ON THEIR MERITS**

*The Wind Farm Does Not Violate 25 CFR § 226.19*

3.     For its first claim, Plaintiff claims the Wind Farm will violate 25 C.F.R. § 226.19. The regulations contained in 25 CFR §§ 226.1 – 226.43 were promulgated pursuant to the Osage Allotment Act ('the Act'), which Congress enacted in 1906.  The Act severed ownership of the mineral estate in Osage County from ownership of the surface estate, establishing a subsurface

mineral estate trust to be held by the United States, on behalf of the Osage Tribe.  *See* 34 Stat.

539; *Quarles v. U.S., ex rel Bureau of Indian Affairs,* 372 F.3d 1169 (10th Cir. 2004).

    4.        Section 226.19 provides in pertinent part:

(a)  Lessee or his/her authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, other appliances necessary for operations and marketing, and the right-of-way for ingress and egress to any point of operations. If Lessee and surface owner are unable to agree as to the routing of pipelines, electric lines, etc., said routing shall be set by the Superintendent. The right to use water for lease operations is established by § 226.24. Lessee shall conduct his/her operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any unavoidable nuisance to be maintained on the premises under his/her control.

(b) Before commencing a drilling operation, Lessee shall pay or tender to the surface owner commencement money in the amount of $25 per seismic shot hole and commencement money in the amount of $300 for each well, after which Lessee shall be entitled to immediate possession of the drilling site. Commencement money will not be required for the redrilling of a well which was originally drilled under the currently lease. A drilling site shall be held to the minimum area essential for operations and shall not exceed one and one-half acres in area unless authorized by the Superintendent. Commencement money shall be a credit toward the settlement of the total damages. Acceptance of commencement money by the surface owner does not affect his/her right to compensation for damages as described in § 226.20, occasioned by the drilling and completion of the well for which it was paid. Since actual damage to the surface from operations cannot necessarily be ascertained prior to the completion of a well as a serviceable well or dry hole, a damage settlement covering the drilling operation need not be made until after completion of drilling operations.

25 CFR § 226.19.

    5.        Published decisions applying § 226.19 typically involve circumstances where a landowner has taken some action to prevent the lessee from accessing its existing oil and gas facilities, and do not involve attempts to enjoin a specific use of the surface estate*.  See, e.g., Glenn v. Fox*, 853 P.2d 779 (Okla. Civ. App. 1993) (enjoining landowner from blocking designated route of ingress); *Appleton v. Kennedy,* 268 F. Supp. 22 (N.D. Okla. 1967) (enjoining landowner from preventing lessee from laying pipeline); *cf. Bell v. Phillips Petroleum Co.,* 641

P.2d 1115 (Okla. 1982) (landowner unsuccessfully challenged necessity of laying new pipeline on his land).

6.      Unlike *Fox* and *Appleton,* this is not a case where the surface owner's lessee is unreasonably interfering with the mineral estate's lessee's reasonable use of the surface. Plaintiff did not demonstrate any interference of the kind that has been historically enjoined by courts.

7.      Plaintiff did not present evidence of legally cognizable conflict between any mineral lessee's planned surface use and the Wind Farm's planned facilities.  Plaintiff presented one mineral lessees' plans for future drillsites and construction of related infrastructure that may occur within the boundaries of the Wind Farm.  The Court concludes that if any actual and/or legally cognizable conflict should arise, and if the conflict cannot be resolved by reasonable accommodations, the mineral lessee may file suit in a court of appropriate jurisdiction.  See Plaintiff's Exhibit 2, page 2, ¶ 7.

8.      Plaintiff failed to establish an existing or threatened violation of Section 226.19 because it did not prove that the Wind Farm would deprive its lessees from having reasonable use of so much of the surface as may be reasonable for their oil and gas operations and marketing.

### *The Wind Farm Does Not Violate Oklahoma Law*

9.      Plaintiff's second claim for relief asserts that the Wind Farm facilities will unreasonably interfere with construction, operation, and maintenance of the flow lines and transmission lines necessary for marketing natural gas in violation of Oklahoma common law. Complaint (Dkt. # 2), ¶¶ 35-38.

10.     It is well settled in Oklahoma that the surface estate is servient to the dominant mineral estate. *Dulaney v. Okla. State Department of Health,* 868 P.2d 676, 680 (Okla. 1993). Oklahoma's Exploration Rights Act of 2011 provides that "the lessee of a wind or solar energy agreement or the wind energy developer shall not unreasonably interfere with the mineral owner's right to make reasonable use of the surface estate, including the right of ingress and egress therefor, for the purpose of exploring, severing, capturing and producing the minerals." OKLA. STAT. tit. 52, § 803(B). Section 803(F) states "[i]t is the intent of this act to confirm the mineral owner's historical right to make reasonable use of the surface estate, including the right of ingress and egress therefor, for the purpose of exploring, severing, capturing and producing the minerals, and nothing in this act is intended to expand or diminish those historical rights. Further, nothing in this act shall amend or modify the surface damages statutes or be interpreted to grant, expand or diminish any person's rights therein." As yet, there are no published cases interpreting or applying this act. The act did not ban wind farms on lands subject to oil and gas leases. The act does not appear to grant the mineral estate any greater rights than those existing under common law.

11.     Although the mineral estate is the dominant estate under Oklahoma law, a mineral owner's right to use the surface is limited to what is reasonably necessary for the operation and development of the mineral lease. *Roye Realty Developing Inc. v. Watson,* 791 P.2d 821, 824 (Okla. Ct. App. 1990). Moreover, "the right of an oil and gas lessee to reasonably necessary surface use must be exercised with due regard to the right of the owner of the surface." *Thompson v. Andover Oil Co.,* 691 P.2d 77, 82 (Okla. Ct. App. 1984).

12.     In *Gulf Pipeline Co. v. Pawnee Tulsa Petroleum Co.,* 127 P. 252 (Okla. 1912), the plaintiff pipeline company purchased a small tract of land subject to an oil and gas lease held by

Pawnee Tulsa Petroleum Company. The pipeline company built a pumping station on its land. The defendant offered to sell its oil and gas lease to the pipeline company "at a price much beyond its real value," but the company refused. The defendant then "stood on their naked right to drill where they pleased," within a few feet of a manifold pit designed to permit the escape of explosive gases incident to the transportation of oil. The pipeline company obtained a temporary injunction to stop the drilling, which the district court later dissolved. Reversing the district court, the Oklahoma Supreme Court noted there were other places in the 80-acre oil and gas lease where the well could be drilled "with safety to the property of the plaintiffs and their employees, and with full protection to the rights of the defendants to take oil and gas from their mining lease." *Id.* at 253. The court explained:

> Having the right to drill anywhere, and the right to occupy the surface not being conveyed to them, but reserved to the owners, it follows that they must exercise their right to drill with due regard to the rights of the owners of the surface, and that where they can fully enjoy their own rights without injury to others they should not be allowed, out of the spirit of wantonness or of blackmail, to jeopardize the property and the lives of others exercising an equal right.

*Id.* at 253-54.

13.     Recognizing the limited nature of the mineral lessee's rights to use the surface, the Oklahoma Supreme Court recently explained that:

> [t]he common-law right of access for drilling and production operations is limited not only to the extent it is **reasonably necessary** but also as provided in the Oklahoma Surface Damages Act. . . . a lessee does not have a common-law right to access an oil or gas well at any specific point of entry regardless of the desires of the surface owner.

*Lierly v. Tidewater Petroleum Co.,* 139 P.3d 897, 903 (Okla. 2006) (internal citations omitted, emphasis in original).[2]

---

[2] *Lierly* involved the issue of whether an oil and gas lessee who seeks an injunction against the surface owner for interfering with the lessee's entry upon the land at a specific location may be liable for damages for malicious

14.     The Court concludes that, in general, the Wind Farm's planned surface use is lawful and reasonable.  Its facilities will take up less than 1.5% of the surface of the 8,500 acres in the Wind Farm lease.  The underground infrastructure of collection lines and the access roads are typical of the type of surface restrictions mineral lessees regularly encounter.  The Tribe has not shown this court the presence of a specific impediment that unreasonably interferes with its use of the surface for oil and gas operations and marketing.  The mere *possibility* that a dispute might arise in the future is insufficient to merit an injunction of the Wind Farm's construction and operation.

15.     The Tribe may not enjoin the construction of surface uses which do not interfere with its right to make reasonable use of the surface estate for the purpose of exploring, capturing and producing the oil and gas.  The Court concludes that Plaintiff is not entitled to an injunction against the Wind Farm under federal or state law.

16.     The Court concludes that Plaintiff has not shown any actual, substantial injury or threatened injury that, under Oklahoma law, would justify an injunction.

## NO IRREPARABLE HARM

17.     The law requires that, in order to obtain an injunction, the Tribe must demonstrate it would be irreparably harmed without an injunction.

18.     The Court concludes the Tribe has failed to establish irreparable harm.  Much of Plaintiff's case is built upon speculative concern that unreasonable interference *may* occur.

19.     At most, the Tribe has demonstrated the possibility of some additional expense *to its lessees* resulting from Wind Farm construction and operation (e.g. drilling additional feet in a Mississippian well due to adjustment of the drill site).  However, as set forth in the findings,

prosecution.  That issue is not present here.  However, the concept of reasonable necessity discussed in *Lierly* is applicable in this case.

above, any such additional expense would impact the mineral lessee, not the Tribe, which holds a non-cost bearing interest.

20.    "If the injury complained of may be compensated by an award of monetary damages, then an adequate remedy at law exists and *no irreparable harm may be found as a matter of law.*"  *Paradise Distributors, Inc. v. Evansville Brewing Co., Inc.*, 906 F. Supp. 619, 622 (N.D. Okla. 1995) (emphasis in original) (citations omitted).   Even if the Plaintiff had demonstrated injury, it is an injury that could be remedied by an award of money damages.   In fact, both Plaintiff's and Defendants' experts presented calculations of the amount of royalties projected to be generated by an expected well in the area.   Based upon this evidence, the Court concludes that, had the Tribe established an injury, the injury could be compensated by an award of monetary damages.

21.    In *Sunray Oil Co. v. Cortez Oil Co.,* 112 P.2d 792 (Okla. 1941), Sunray obtained a license from the surface owner to use an abandoned oil and gas well in order to dispose of salt water produced from other wells in the vicinity.   Cortez Oil, being concerned that the salt water might force oil and gas from the land, obtained an injunction prohibiting use of the injection well.   The Oklahoma Supreme Court vacated the injunction, stating that an injunction may not issue to protect a right that might never arise or where the alleged damage is merely nominal, theoretical, or speculative, and that, as a general rule, a complainant must establish an actual substantial injury.   *Id.* at 795.   "It is not sufficient ground for injunction that the injurious acts may possibly be committed or that injury may possibly result from the acts sought to be prevented; but there must be at least a reasonable probability that the injury will be done if no injunction is granted, and not a mere fear or apprehension of same."   *Id.* at 796, quoting *Simons*

*v. Fahnestock*, 78 P.2d 388 (Okla. 1938).  The court concludes that Plaintiff has not carried its

burden to establish a reasonable probability that harm will be done if no injunction is granted.

## THE THREATENED INJURY DOES NOT OUTWEIGH THE HARM
## THE INJUNCTION WOULD CAUSE THE OPPOSING PARTY

22.     On the basis of its Findings of Facts Nos. 32 and 33, the court concludes Plaintiff

has failed to show that its claim of threatened injury, which is speculative and hypothetical,

outweighs the injunction's certain harm to Defendants.

## AN INJUNCTION AGAINST THE WIND FARM WOULD
## ADVERSELY AFFECT THE PUBLIC INTEREST

23.     "Congress has articulated the public policy that our nation should incorporate

clean energy as a necessary part of America's future and it is essential to securing our nation's

energy independence and decreasing green house emissions."  *Western Watersheds Project v.*

*Bureau of Land Management,* 774 F. Supp. 2d 1089, 1103 (D. Nev. 2011) (denying preliminary

injunction against wind farm project in part because it would be adverse to public interest). The

injunction requested by the Plaintiff would be adverse to this stated public policy.

24.     Defendants presented evidence of economic benefits that the Wind Farm will

provide the State of Oklahoma, including the addition of 10 to 12 permanent jobs in an area of

high unemployment.  These economic benefits would be lost if the project is enjoined.

25.     The Oklahoma Legislature recently issued the following findings in support of

wind energy development, but striking a balance between the development of wind energy

resources and the right of mineral estate owners to make reasonable use of the surface estate:

1.      Oklahoma's wind energy resources are an important asset for the continued
        economic growth of the state and for the provision of clean and renewable power
        to both the people of the state and the nation as a whole;

2.      Promotion of the development of wind energy resources is important to the
        economic growth of the state;

  3.  The prudent development of wind energy resources requires addressing the relationship of the needs of wind energy developers with those of the mineral estate owners who have the historical right to make reasonable use of the surface estate, including the right of ingress and egress therefor, for the purpose of exploring, severing, capturing and producing the minerals as reflected in the Exploration Rights Act of 2011, . . .

Okla. Stat. tit. 17 § 160.12; *see also* Okla. Stat. tit. 17 § 801.4 (establishing a goal that fifteen percent (15%) of all installed electricity generation within the State of Oklahoma by the year 2015 be generated from renewable energy sources)

  26.  Being mindful of the Congressional and Legislative goals in support of renewable energy resources while balancing the rights of mineral estate owners, this court concludes that an injunction against the Wind Farm would adversely affect the public interest.

  In short, plaintiff has not met its burden on its claims for declaratory and injunctive relief under either federal or state law.  Plaintiff did not prove that the Wind Farm will unreasonably interfere with plaintiff's right to make reasonable use of the surface estate, nor did it prove that the Wind Farm will unreasonably hinder the right to use so much of the surface as may be reasonable for oil and gas operations and marketing.  Plaintiff also failed to prove that it would be irreparably harmed unless an order enjoining construction and operation of the Wind Farm is granted; that the threatened injury to the Tribe outweighs the harm the injunction may cause the defendants; and that the injunction, if issued, would not adversely affect the public interest.  Accordingly, The Osage Nation's request for declaratory relief and a permanent injunction barring Defendants from constructing a wind farm in Osage County, Oklahoma, is denied and the action shall be dismissed on the merits by separate Judgment entered contemporaneously herewith.

DATED this 20th day of December, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma